[No. 49494–1.   En Banc.   June 7, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID MARTIN, *Petitioner.*

*Judith S. Dubester,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Rebecca J. Roe, Senior Deputy,* for respondent.

DORE, J.—Defendant Martin appeals his conviction of first degree statutory rape. The issue on appeal, one of first impression here, involves the admissibility of the testimony of the alleged victim after she was hypnotized because she could not remember anything about the alleged incident. In accord with recent and persuasive case law and the overwhelming consensus of expert opinion, we conclude that testimony by a witness as to a fact which became available following hypnosis is inadmissible in the trial of criminal cases in this state. We also hold, however, a witness *may* testify based on what he knew before hypnosis, provided the appropriate safeguards are present. We reverse and remand for a new trial.

I

Martin was charged with first degree statutory rape. He waived his right to a jury trial and was tried by the court. Martin and his wife, Shirene, had been living with Lesha, her 10–year–old daughter, and their 2½–year–old daughter. At about 4 o'clock one morning, Shirene got up to investigate the younger child's crying. She went into the girls' bedroom and found David on top of Lesha's bed with Lesha under the covers. David's pants were down to his hips, but his underwear was on. Shirene took the younger child into

the living room, woke David up, and said, "I hope this isn't what it looks like". When Lesha sat up, Shirene asked her if David had done anything to her. Lesha answered that she did not know. David had become outraged by the accusation and asked Shirene if she was crazy and what she meant by her question. A violent argument ensued, which ended with Shirene taking the younger child to Shirene's mother's house and calling the police.

A King County police officer testified that he arrived at the Martin residence and met David in the front yard. David appeared to be intoxicated and was agitated about the accusation of sexual abuse. The officer stated that David wanted to take Lesha to the hospital immediately to prove his noninvolvement.

The next day Shirene took Lesha to the sexual assault center at Harborview Hospital where cultures were taken. The throat culture was positive for gonorrhea. A doctor testified that gonorrhea can be cured by antibiotics within a matter of days or, in men, by a spontaneous curing within a matter of weeks. There is no reliable test to determine whether or not a person has ever had gonorrhea. The doctor testified that transmission by kissing is possible, but unlikely.

During the following weeks, Shirene and Lesha stayed much of the time with Shirene's sister. During this time, Lesha maintained she had no memory of any sexual abuse. Shirene Martin testified, however, that on one occasion she asked Lesha "if it was David". Lesha told Shirene that she could not say it was David because that would not be true.

On June 21, 1980, Shirene met Norah Teeter, a lay hypnotist, at an open house party where Teeter worked. They discussed the possibility of Teeter treating Lesha. Shirene brought Lesha to Teeter's office at the Evergreen Hypnosis Center on June 26, 1980. Teeter allegedly hypnotized Lesha twice. These incidents form the basis of this appeal.

## II

At trial, Teeter characterized herself as a clinical hypno-

therapist. She said that her formal background consisted of 400 hours of training, and that she had worked 4 years in the field. The last 2 years were at Evergreen Hypnosis Center as a clinical hypnotherapist and associate director of the Center. The major part of her work involved "regressive hypnosis" to uncover repressed material. Her highest level of academic achievement was a bachelor's degree in philosophy and psychology. She was subsequently enrolled in developing her own program at Antioch College West for a master's degree in psychology, with emphasis on hypnotherapy. Thirteen months prior to this court experience, she had taken a 3–day course in forensic hypnosis and later received some additional training in this field. She had been involved in forensic hypnosis training of detectives for two local police departments. This was her first experience testifying in court.

During Teeter's testimony, the court viewed the videotape of a portion of Lesha's first session, in which she stated that David had put his penis in her mouth on the night in question. Teeter conducted a second session, and the court listened to an audiotape of this portion of the second session which subsequently was transcribed for this court and placed in the record.

The trial court was apparently unaware that during another part of this second session Teeter "regressed" Lesha back to the time before she was born, while she was in the womb. Lesha described, in some detail, thoughts which she claimed to have had while a fetus, as well as her mother's and others' conversations while she was in the womb, including a discussion of terminating her mother's pregnancy. Teeter then had Lesha recount some of the significant events in her life, including when she learned to crawl and her parents' separation.

After the hypnotic sessions, Lesha made a tape recording for her mother at her aunt's suggestion. In this tape, Lesha stated that she had the feeling that it was not David, but her grandfather, who was responsible for what had happened to her. Lesha later stated that what she said in the

tape was not true. Apparently, her mother had begun a reconciliation with David, and Lesha made the tape so that she would not be separated from her mother. The grandfather testified for the State that he had never molested Lesha.

Early in the trial, Martin filed a motion in limine to exclude Lesha's testimony. The trial court ruled that the prosecutor had to lay a proper foundation by establishing "proper credentials of the hypnotist, proper recreation of the scene, the tests, [and] the hypnotic trance" before Lesha's testimony would be heard. Report of Proceedings, at 77–78. The prosecutor then called Teeter to testify. Apparently at no point during this testimony did defense counsel question Teeter's qualifications as an expert. No objection was made when the videotape of the hypnotic session was shown or when the audiotape of the second session was presented. Much later in the trial, the State moved that both the video– and audiotapes be marked and admitted. Defense counsel had no objection to the admission of these tapes.

Teeter testified concerning an "ideomotor" signal response system she used to verify Lesha's verbal communication. While Lesha was under hypnosis, Teeter instructed her that raising the index finger of her right hand would represent to her deep in her mind the answer "yes". Moving the little finger of Lesha's right hand would mean "no," and the thumb would represent "I do not want to tell you." Report of Proceedings, at 93. Teeter then checked Lesha's muscular reaction, which she labeled as automatic and spontaneous, during questioning while Lesha was under hypnosis.

After Lesha and Teeter testified, the court denied the motion in limine and admitted Lesha's testimony. Lesha testified that she did not remember the alleged offense prior to the time she was first hypnotized by Teeter, but that she remembered it afterward. She also testified on cross examination that she was aware before the hypnotic session that her mother, her aunt and her grandmother

were concerned that David might have sexually molested her on the evening in question.

In his testimony, Martin denied the charged sexual offense. He said that on the evening in question he got off work at about 10:45 p.m. and then went drinking. Shortly after returning home at about 12:30 or 1 a.m., he started to feel nauseated from his drinking, so he took a pillow and went into the bathroom. He heard the younger child crying and went into the bedroom, comforted her, and then lay down on Lesha's bed, just "looking for a place—any place to lie down". Report of Proceedings, at 265. The next thing he knew, his wife, Shirene, came into the bedroom.

Martin further testified that he first learned that Lesha had gonorrhea on a Friday in the beginning of July. He immediately called the hospital to find out about being tested himself. He was tested the following Monday and such tests for gonorrhea were negative.

After hearing of Lesha's hypnotic sessions, Martin called Teeter so that he, too, could be hypnotized. Teeter referred him to Marguerite Hodder, another lay hypnotist. Hodder testified that she hypnotized Martin and regressed him to the evening in question, which he experienced under hypnosis as a revivification. It appeared from this revivification that he committed no sexual offense whatsoever. This hypnotic session was audio taped and the court heard the tape as an offer of proof with respect to the defense motion in limine regarding Lesha's testimony. Defense counsel had this tape marked and put into evidence.

The trial court found Martin guilty as charged, and entered findings of fact and conclusions of law. The judge at trial was thereafter appointed to the State Supreme Court. Martin was sentenced by another judge who denied the motion for a new trial. In his oral ruling, the judge said, "[T]he remedies that the defendant is applying for are ones that are available in the Appellate Court at this juncture". Court's oral decision, at 2.

Martin's appeal from this ruling was consolidated with his other appeal and the Court of Appeals affirmed in an

opinion filed December 27, 1982. The appellate court said Teeter was shown to be well qualified, and that it was apparent from viewing the videotape that Lesha was in a deep trance and related the details of her being sodomized "with great difficulty and with simple truth".

### III

The standard governing the admissibility of testimony based on scientific experimental procedures at a criminal trial was enunciated in *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923). There, the court ruled that evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community. The *Frye* court held lie detector results inadmissible, stating:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well–recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

This court has explicitly adopted the *Frye* standard for determining the admissibility of scientific evidence such as retesting of Breathalyzer ampuls and polygraph examinations. *See State v. Canaday,* 90 Wn.2d 808, 812–13, 585 P.2d 1185 (1978); *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974). Scientists in the field must make the initial determination whether an experimental principle is reliable and accurate. *State v. Canaday, supra* at 813.

We believe the reasoning behind the *Frye* rule applies to hypnotically aided testimony. We are concerned not so much with whether the process is scientific as with whether a jury can realistically evaluate the effect of hypnosis. Absent general scientific acceptance of hypnosis as a reliable means of refreshing recollection, the dangers and

possibilities of prejudice should preclude admission of evidence based upon it. *Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983); *see also State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 198 & n.3, 199 & n.4, 644 P.2d 1266 (1982).

We could adopt a rule which allows each party to offer expert testimony on the effects of hypnosis in each particular case, provided specific procedures are followed. The New Jersey Supreme Court would allow the admission of hypnotically induced testimony where the following procedures were met:

(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.

(2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.

(3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.

(4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.

(5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.

(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre–hypnotic testing and post–hypnotic interview.

*State v. Hurd,* 86 N.J. 525, 533, 432 A.2d 86 (1981), *quoted in State v. Long,* 32 Wn. App. 732, 736–37, 649 P.2d 845

(1982).

We believe the *Hurd* procedural standards would only be time consuming and expensive, and would inject unnecessary confusion into the judicial process. *People v. Shirley,* 31 Cal. 3d 18, 39, 641 P.2d 775, 181 Cal. Rptr. 243, *cert. denied,* 459 U.S. 860, 74 L. Ed. 2d 114, 103 S. Ct. 133 (1982). We decline to mire the judicial process with individual determinations unless there is general acceptance by experts in the field that hypnosis is both reliable and accurate. A substantial majority of courts that have dealt with the issue recently have applied the *Frye* test in determining the admissibility of hypnotically aided testimony. *See State ex rel. Collins v. Superior Court, supra* at 199–202; *People v. Shirley, supra* at 40; *Commonwealth v. Kater, supra,* 447 N.E.2d at 1196; *Polk v. State,* 48 Md. App. 382, 394, 427 A.2d 1041 (1981); *State v. Mack,* 292 N.W.2d 764, 768 (Minn. 1980); *People v. Hughes,* 88 A.D.2d 17, 452 N.Y.S.2d 929 (1982); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 101, 436 A.2d 170 (1981). It is this standard which we now apply to the admission of the evidence obtained through the use of hypnosis in the present case.

Rather than showing a general acceptance of the reliability of hypnotically induced testimony, the views of experts in the field indicate it is an unreliable means of enhancing recall. A hypnotic state produces hypersuggestibility and hypercompliance in the subject, making the subject prone to sheer fantasy, willful lies, or a mixture of fact with gaps filled in by fantasy. Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. of Clinical & Experimental Hypnosis 311, 317–18 (1979). *See also* Comment, *Hypnosis: A Survey of Its Legal Impact,* 11 Sw. U. L. Rev. 1421, 1442 (1979). The hypnotized subject is particularly prone to indulge in confabulation, the filling in of gaps in memory to please the hypnotist. Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313, 335 (1980).

Many of the problems associated with hypnotically induced testimony make its use in trial particularly dan-

gerous. After hypnosis, neither subject nor expert observer is able to distinguish between confabulations and accurate recall in any given case, absent corroborating evidence. *See* Beaver, *Memory Restored or Confabulated by Hypnosis— Is it Competent?*, 6 U. Puget Sound L. Rev. 155, 199 (1983). The subjective conviction in the truth of the memory after hypnosis eliminates fear of perjury as a factor ensuring reliable testimony. Additionally, effective cross examination is seriously impeded, as the witness cannot distinguish between facts known prior to hypnotism, facts confabulated during hypnosis to produce pseudomemories, and facts learned after hypnosis. Finally, jury observation may be adversely affected, as the witness, as a result of the hypnosis, will have absolute subjective conviction about a particular set of events, whether or not his perceptions are objectively accurate. Beaver, at 200–01. It is this tendency toward immunization from meaningful cross examination in particular that leads us to conclude that a person, once hypnotized, should be barred from testifying concerning information recalled while under hypnosis. Hypnosis in its current state simply does not meet the *Frye* standards of reliability and accuracy.

## IV

Our holding today, however, does not bar witnesses from testifying as to facts recalled prior to hypnosis. So long as the trial court is careful to limit testimony to the witness' prehypnotic memory of events, and opposing counsel has the opportunity to demonstrate to the jury that the witness has been subjected to hypnosis, the danger of prejudice is minimized. A detailed record of the witness' prehypnotic memory should be preserved, as the party offering the testimony will have the burden of establishing what the witness remembered prior to the hypnosis. Any uncertainties should be resolved in the opponent's favor. If the judge admits the testimony, the opponent must be given the opportunity to show the possible effect of the hypnosis on the witness' testimony, and the manner in which the hyp-

nosis was conducted. Special jury instructions[1] regarding the hypnosis may also be warranted. This approach, taken by the Supreme Judicial Court of Massachusetts in *Commonwealth v. Kater, supra,* most effectively prevents the possibility of prejudice always present with a witness who has been hypnotized. *See also Emmett v. State,* 232 Ga. 110, 205 S.E.2d 231 (1974); *State v. Mack, supra.*[2]

We recognize our decision here will substantially reduce the likelihood of the use of hypnosis to develop evidence against a criminal defendant. In the future, the police officer or prosecutor considering hypnotizing a potential witness must proceed with caution and weigh the risk of losing that witness' testimony against the possibility of obtaining corroborative evidence. Absent some independent verification that the witness' testimony consists of prehypnotic memory, the propriety of its admission is questionable.

We next apply the principles announced above to the case at hand. As Lesha was unable to remember anything regarding the alleged incident prior to hypnosis, her testimony regarding the identification of the defendant and the act which allegedly occurred on the night in question is inadmissible. Without Lesha's testimony as to the details of the incident, the evidence against the defendant was, at best, circumstantial. It may be possible to draw reasonable inferences from the other evidence presented, but the State's case is severely handicapped by the loss of Lesha's testimony. While a retrial may be costly and time consuming, the record before us, absent Lesha's testimony as to the

---

[1]Such instructions might caution the jury that in assessing the credibility of a particular witness, they may consider the fact that the witness underwent questioning while hypnotized and the circumstances under which the hypnotic session was conducted.

[2]The procedural safeguards suggested in *State v. Hurd,* 86 N.J. 525, 533, 432 A.2d 86 (1981) present reasonable guidelines for conducting any hypnotic session involving a person whose prehypnotic memory may be offered into evidence at a later date. As was suggested in *United States v. Adams,* 581 F.2d 193, 199 n.12 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978), an audio or video recording of the interview would be helpful.

defendant's criminal actions, compels us to order a new trial.

### CONCLUSION

Hypnosis does not meet the *Frye* test at this time[3] as a means of accurately restoring or improving memory. We hold that hypnotized witnesses may not testify in criminal trials as to facts not remembered by witnesses prior to hypnosis. They may, however, testify as to facts recalled prior to hypnosis. The burden of establishing what the witness recalled prior to hypnosis is on the party seeking to admit the testimony.[4]

We reverse the defendant's conviction and remand for a new trial.

WILLIAMS, C.J., and ROSELLINI and PEARSON, JJ., CONCUR.

STAFFORD, J. (concurring)—I concur. I am concerned, however, that there exists a real danger in admitting testimony of prehypnotic memory absent strong corroboration.

The majority attempts to distinguish between prehypnotic and posthypnotic memory, finding the witness' recollection of only the former admissible. A previously hypnotized witness may be unable to distinguish between prehypnotic memory and posthypnotic confabulations, however. *See* Beaver, *Memory Restored or Confabulated by Hypnosis— Is it Competent?,* 6 U. Puget Sound L. Rev. 155, 199–200 (1983). As a result, the witness may be incompetent to testify.

A previously hypnotized witness does not lack competency because of a failure to understand the duty to tell the truth. *See People v. Shirley,* 31 Cal. 3d 18, 67, 641 P.2d 775, 181 Cal. Rptr. 243, 273, *cert. denied,* 459 U.S. 860, 74

---

[3]This holding does not preclude the admission of hypnotically induced testimony in the future, when techniques used may become more reliable.

[4]*See also People v. Hughes,* 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255 (1983) wherein, in a rape case, testimony was barred based on a witness' hypnotically refreshed recollection.

L. Ed. 2d 114, 103 S. Ct. 133 (1982). Rather, the witness may be incompetent due to an inability to know what the truth is. The witness may sincerely believe that facts recalled are from prehypnotic memory. Yet, because the witness was once hypnotized, this sincere belief may be completely erroneous. Further, cross examination may be ineffective due to the witness' subjective conviction in the truth of his testimony. *See* Beaver, at 200–01. Absent some independent verification that the witness' testimony consists of prehypnotic memory, the propriety of its admission is questionable.

WILLIAMS, C.J., and PEARSON, J., concur with STAFFORD, J.

BRACHTENBACH, J. (concurring)—I concur in the majority's result and with Justice Stafford's concurring opinion. At the risk of repeating some of the points made in both opinions, however, I add my own views in order to clarify what I perceive to be the problem with the dissenters' analysis in this case.

The dissenters state that the *Frye* standard is not applicable because no expert witness is testifying to truth or accuracy of information obtained by scientific methods. *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). The dissenters feel the only issue that hypnosis involves is a witness' testimony after hypnosis, and, therefore, only the reliability of the specific memory as affected by the specific hypnosis session is in question. As both dissents present the question, the issue is simply a matter of witness credibility, best left to the jury.

Underlying the dissenters' approach are two assumptions. The first assumption is that the only problem with hypnosis is that overt suggestion can occur *during* a hypnosis session and a trial court can judge a hypnosis session and determine if any impermissible suggestion occurred. The second assumption is that hypno–induced memory is as reliable as ordinary recall. I feel these assumptions, and

therefore, the dissenters' conclusions are not accurate.

Admittedly, the dissenters are correct in asserting the *Frye* test is utilized to prevent experts from testifying in court as to the results of a scientific process for this is the context in which the issue usually arises. The dissenters' approach, however, ignores the basic theory underlying the *Frye* test: until a novel process is proven reliable, it has no place in court. *See* Giannelli, *The Admissibility of Novel Scientific Evidence: "Frye v. United States", A Half–Century Later,* 80 Colum. L. Rev. 1197 (1980). *State v. Canaday,* 90 Wn.2d 808, 811–13, 585 P.2d 1185 (1978). The reason experts are not allowed to testify about the results of the scientific process is because the process itself is not reliable.

Similarly, the process of hypnosis is being used to "enhance" a person's memory. That enhanced memory, the result of the process of hypnosis, is presented to the jury as factually *reliable* memory. The direct result of that process is the factually reliable memory and cannot be disassociated from the hypnosis process itself. *See People v. Shirley,* 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, *cert. denied,* 459 U.S. 860, 74 L. Ed. 2d 114, 103 S. Ct. 133 (1982); *Polk v. State,* 48 Md. App. 382, 427 A.2d 1041 (1981). *See also* Beaver, *Memory Restored or Confabulated by Hypnosis—Is it Competent?,* 6 U. Puget Sound L. Rev. 155, 181–82 (1983) (hereinafter cited as Beaver, *Memory Restored).*

The dissenters cannot dispute the fact that the only reason hypnosis is utilized in criminal investigations is for retrieval of factual information theoretically stored in the witness' mind. Therefore, the issue is whether hypnosis is a reliable method of retrieving factual information. Accordingly, the process itself, hypnosis, must be judged before the product of the process, enhanced memory, is presented at trial. Therefore, the *Frye* test applies to the process of hypnosis and in my opinion does not pass this test.

The dissenters attempt to bolster their conclusion that *Frye* is inapplicable by listing some of the problems associ-

ated with hypnosis and concluding that, based on its examination of the scientific literature, hypnosis is a valuable tool and is comparable in reliability to ordinary recall. This statement is almost a tacit conclusion that the *Frye* test has been met. *Cf. State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981) (the *Hurd* court has employed a slightly different variation of *Frye,* however). While in a *clinical setting* hypnosis has been found to be a valuable tool, the issue before this court is its forensic use. The medical journals cited by the dissenters all endorse the *clinical* use of hypnosis and do not address its forensic use.

In some cases hypnosis may help an individual recall facts and may lead to investigative leads. *See* Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. of Clinical & Experimental Hypnosis 311 (1979). However, no one, the hypnotized individual, the court or hypnotist can say when that occurs. As the dissenters recognize, neither the subject nor the hypnotist (nor a court or jury) can separate true memories from fantasies. In more concrete terms no one can tell if a memory is false or true, yet inevitably it is presented as factually accurate recall.

The dissenters, however, tacitly analogize hypno–induced memories to the problems associated with normal witness memory to sidestep this problem. The fact that normal witness recall is prone to many of the shortcomings associated with hypnosis, *see State v. Hurd, supra*; Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 Stan. L. Rev. 969 (1977) (hereinafter cited as Note, *Unreliability*), does not lead to the conclusion, adopted by the dissenters, that hypno–induced recall is comparable in reliability to ordinary recall.

The fact is that the person's memory after hypnosis is *not* a product of ordinary recall. The only reason hypnosis is used is to allow a person to recall facts they could not remember with ordinary recall. While ordinary recall may be tainted, *see* Note, *Unreliability,* we must accept it and rely on the trial system, *i.e.,* cross examination, to purge the

taint inherent in fallible human memory. However, with hypnosis this safeguard is useless.

After hypnosis, a person is subjectively convinced in the truth of his memories. This fact is universally recognized and affects the memories remembered during hypnosis. *See generally* Beaver, *Memory Restored,* and authorities cited therein. Thus, normally tainted human recall is further tainted by the process and side effects of hypnosis. A person is unshakeable in his belief in the accuracy of his memories which may totally alter his demeanor and attitude in court. The effects of hypnosis effectively eliminate the only real safeguard interposed between the fallibilities of ordinary recall and the jury. This fact in and of itself leads me to the conclusion that, at the present time, hypnosis has no place in the law.

The dissenters believe procedural safeguards can guard against the evils associated with hypnosis. Relying on *State v. Hurd, supra; People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848 (1979) and *State v. Armstrong,* 110 Wis. 2d 555, 329 N.W.2d 386 (1983), the dissenters conclude that procedural safeguards can guard against any impermissible suggestion that may occur in the process. I feel these procedural safeguards are unworkable and fail to address the problems associated with hypnosis.

Hypnosis is defined as a suggestive process. It is not like a lineup or showup that can be viewed objectively for aspects of suggestiveness. How a trial court is to determine when a hypnosis session is suggestion free, when even trained professionals are unable to do so, is beyond me. More troublesome is the fact that even the most suggestion free session will *not* definitely produce reliable memory. Confabulation can occur at any time and neither the hypnotist nor the subject can tell factual memories from fantasies. Also, suggestions can be implanted in the subject's subconscious at *any time* during the investigatory process and not foster itself until the person is hypnotized. Therefore, the memory may be the product of suggestion that *no procedural safeguards can detect or prevent.*

Additionally, the process itself makes procedural safeguards meaningless. A second aspect of hypnosis is hypercompliance.

> The subject's increased compliance stems from the feeling of a close relationship promoted by the hypnotist to ensure cooperation. It is a cooperative effort in which the therapist aids the subject by means of a specialized knowledge and technique to achieve a purpose which both have agreed upon as valid and worthwhile. It must be remembered that the typical witness will be hypnotized after interviews by police authorities. The purpose of the hypnosis is the noble and worthwhile goal of remembering forgotten facts about the crime to which one has been exposed.

(Footnotes omitted.) Beaver, *Memory Restored,* at 194. *See also Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981).

> A subject's awareness of the purpose of the hypnotic session, coupled with the hypersuggestibility which the subject experiences, amounts to a situation fraught with unreliability.

*Nazarovitch,* at 104. If a person undergoes hypnosis specifically to remember forgotten facts about a crime he is exposed to, hypnosis may allow him to remember some facts just to please the hypnotist. *Cf. People v. Shirley,* at 30. ("[The subject] 'just knew' that it enables a person to 'remember more than normal.'") *See also* Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313 (1980). Whether the remembered "facts" are true or false is not objectively ascertainable absent independent verification.

I believe that independent verification does not lend itself to the particular problem associated with the forensic use of hypnosis. However, hypnosis is usually used in cases involving witnesses or victims of crimes who cannot remember important aspects of the crime. Almost always their posthypnotic memories result in identification of the perpetrator of the crime. This case is an excellent example. *See also Commonwealth v. Kater,* 388 Mass. 519, 447

N.E.2d 1190 (1983); *People v. Hughes,* 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255 (1983); *People v. Shirley, supra; Commonwealth v. Nazarovitch, supra; State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn. 1980). The fact remains that the individual identification may be the result of a false memory produced through the use of hypnosis and no independent verification can be made of this "remembered fact".

Finally, the approach will inevitably relegate the issue of hypnosis to a battle of the experts. Once the prosecution masters the procedural aspects of conducting a "suggestion free" hypnosis session, no great task, the jury will simply be asked to evaluate the accuracy of a hypnotized memory. The experts will only be able to inform the jury that hypnosis may or may not allow for accurate recall. The jury is in no position to judge the reliability of a hypnosis session, and the testimony resulting therefrom, when even trained professionals cannot do so.

Therefore, this court must address the problems associated with hypnosis. Until the scientific community is able to say that hypnosis is a reliable method of "refreshing one's recollection", the results of this forensic tool should not be placed before the jury.

WILLIAMS, C.J., and PEARSON, J., concur with BRACHTEN-BACH, J.

DOLLIVER, J. (dissenting)—The earliest reported case involving the question of whether the hypnosis of a witness so tainted subsequent testimony as to make that testimony inadmissible appears to be *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1967), *cert. denied,* 395 U.S. 949 (1969). As recently as 1979, the Illinois Court of Appeals said no case had been brought to its attention which had ruled the testimony of a previously hypnotized witness to be inadmissible. *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848 (1979). As noted by the United States Court of Appeals for the Ninth Circuit, per Wright, J.:

We have held that the fact of hypnosis affects credibility but not admissibility. *Kline v. Ford Motor Company, Inc.,* 523 F.2d 1067, 1069 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir. 1974).

Other courts considering this problem in the context of criminal trials have generally followed the same approach. *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312, 315–16 (1971); *Harding v. State,* 5 Md.App. 230, 246 A.2d 302, 311–12 (1968). Reversals have been predicated only on the failure to disclose the fact of hypnosis. *United States v. Miller,* 411 F.2d 825 (2nd Cir. 1969); *Emmett v. Ricketts,* 397 F.Supp. 1025 (N.D.Ga. 1975) (habeas writ issued). We believe this reasoning is sound.

*United States v. Adams,* 581 F.2d 193, 198 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978).

Until the late 1970's most jurisdictions, although recognizing the possibility that a jury might misinterpret and misuse the testimony of those who had been previously hypnotized, believed this danger was outweighed by the probative value of the testimony of the witness. *See, e.g., United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885 (1979); *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978); *Chapman v. State,* 638 P.2d 1280 (Wyo. 1982). *See Chapman v. State: Hypnotically Refreshed Testimony—An Issue of Admissibility or Credibility,* 1983 Utah L. Rev. 381. This approach is consistent with the policy of liberal admissibility included in the Federal Rules of Evidence, the Model Code of Evidence, and the rules of this court, ER 401, 402; CrR 6.12. *See* E. Cleary, *McCormick on Evidence* §§ 184, 185 (2d ed. 1972). As McCormick notes:

The common law rules of incompetency have been undergoing a process of piecemeal revision by statutes for over a century, so that today most of the former grounds for excluding a witness altogether have been converted into mere grounds of impeaching his credibility.

E. Cleary § 61, at 139. *See* ER 601, 607. *See* Beaver, *Memory Restored or Confabulated by Hypnosis—Is it Competent?* 6 U. Puget Sound L. Rev. 155, 182–85 (1983).

Since 1980 it appears a majority of courts which have

examined the question have held posthypnotic testimony inadmissible. *Commonwealth v. Kater,* 388 Mass. 519, 447 N.E.2d 1190 (1983); *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983) (overruling *Harding v. State, supra*); *People v. Shirley,* 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, *cert. denied,* 459 U.S. 860, 74 L. Ed. 2d 114, 103 S. Ct. 133 (1982); *State v. Culpepper,* 434 So. 2d 76 (La. App. 1982); *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *People v. Gonzales,* 108 Mich. App. 145, 310 N.W.2d 306 (1981); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn. 1980).

Subsequent to their opinions in *Mena* and *Palmer,* however, the Arizona and Nebraska courts abandoned the rule of inadmissibility per se and now hold hypnosis does not render a witness incompetent to testify to those facts recalled prior to hypnosis. *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983). *See also People v. Hughes,* 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255 (1983); *State v. Koehler,* 312 N.W.2d 108 (Minn. 1981). This is the rule adopted by the majority here.

Nevertheless, since 1980 a number of jurisdictions have refused to hold posthypnotic testimony incompetent and have allowed it to be admitted. *Chapman v. State, supra; State v. Brown,* 337 N.W.2d 138 (N.D. 1983); *State v. Beachum,* 97 N.M. 682, 643 P.2d 246 (Ct. App. 1981); *Pearson v. State,* ___ Ind. ___, 441 N.E.2d 468 (1982) (*but cf. Peterson v. State,* ___ Ind. ___, 448 N.E.2d 673 (1983)); *People v. Gibson,* 117 Ill. App. 3d 270, 452 N.E.2d 1368 (1983); *Brown v. State,* 426 So. 2d 76 (Fla. Dist. Ct. App. 1983); *United States v. Waksal,* 539 F. Supp. 834 (S.D. Fla. 1982); *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981).

The majority begins its analysis by extending the *Frye* rule to the admissibility of hypnotically induced testimony. Although this extension of *Frye* has achieved some popularity (*see People v. Shirley, supra*), I believe it rests on a fundamental misunderstanding of the rule. In *Frye v.*

*United States,* 293 F. 1013 (D.C. Cir. 1923), the question before the court was whether an expert witness for the defendant could testify as to the result of a "systolic blood pressure deception test". The testimony by the expert would go to the truth or falsity of what the defendant stated and would be solely based on the reactions of the defendant as interpreted by the expert witness. In reporting the testimony of the expert witness, the court stated:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well–recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
>
> We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made.

293 F. at 1014.

This court explicitly adopted the *Frye* standard in *State v. Canaday,* 90 Wn.2d 808, 812–13, 585 P.2d 1185 (1978) (Breathalyzer). *See also State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974) (polygraph). In *Canaday* we stated:

> The rationale of the *Frye* standard is that expert testimony may be permitted to reach a trier of fact only when the reliability of the underlying scientific principles has been accepted by the scientific community. *See United States v. Franks,* 511 F.2d 25 (6th Cir. 1975). *See also* J. Richardson, *Modern Scientific Evidence* §§ 6.2, 6.3 (2d ed. 1974). In other words, scientists in the field must make the initial determination whether an experimental principle is reliable and accurate. This court adheres to the rule that the reliability of scientific evidence must be shown as a prerequisite to its admission.

90 Wn.2d at 813.

The thrust of *Frye* and of the court's opinion in *Canaday*

is to prevent expert witnesses from testifying as to the truth of statements obtained by scientific methods unless there has been an acceptance by the scientific community of the underlying principles of the procedure.

In a recent unanimous opinion, the Wisconsin Supreme Court detailed the reasons for the inapplicability of *Frye* to hypnotically induced testimony. I find the reasoning of the Wisconsin court persuasive:

Even if this court applied the test set out in *Frye,* that test could not be used to determine the admissibility of hypnotically affected testimony. *Frye* applied to the admissibility of "expert testimony deduced from a well–recognized scientific principle." 293 F. at 1014. Here, it is not expert testimony that is challenged. Rather, it is the admissibility of an eyewitness' post–hypnosis identification which is in question.

In the case of expert testimony deduced from a scientific technique, under *Frye,* as an initial matter, it is the technique which is in effect on trial before the court. However, the trial judge is not required to do an independent examination as to the scientific principles which underlie the technique. He does not have to have experiments conducted in court to verify the reliability of the technique. Instead, he evaluates the opinions of people who have spent sufficient time in the study of the field to qualify as an "expert." If there is a sufficient number of "experts" who accept the validity of the technique, the judge will allow an expert to testify regarding deductions he has made from that technique.

But it is not the reliability of hypnosis to put one in a hypnotic trance that is at issue when the witness testifies. It is the reliability of a specific human memory as affected by hypnosis that must be examined. There are no experts who can testify as to what specific effects hypnosis has had on the witness' memory; just as there are no experts who can testify that a normal waking memory of an event is in fact a completely accurate representation of what actually occurred. The most a trial judge can do is review the hypnotic session to ensure that no impermissible suggestiveness has occurred. However, in such a review, it is not the reliability of hypnosis that is to be examined. Rather, it is the effect of a specific hypnotic session that is to be determined.

(Footnote omitted.) *State v. Armstrong,* 110 Wis. 2d 555, 567–68, 329 N.W.2d 386 (1983).

Additional persuasive arguments against the applicability of the *Frye* rule to hypnotism are given by Professors Spector and Foster in Spector & Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Suscepti-ble?,* 38 Ohio St. L.J. 567, 584 (1977):

Conceptual bars to judicial recognition of hypnosis as a valid evidentiary technique evolve from the courts' negative assessment of hypnotic processes as a reliable indicator of veracity. Unfortunately, hypnosis has become linked in the minds of courts and commentators with the polygraph and narcoanalysis as a technique for mechanically ascertaining the truth of the witness' testimony. Requiring hypnosis to perform a truth–determinant function, however, distorts the scientific process and aborts its potential benefit to litigation. The value of hypnosis lies in its scientifically–established reliability as a device for retrieving relevant testimony previously forgotten or psychologically suppressed, *regardless* of the factual truth or falsity of that testimony.

Factual accuracy of testimony is not an inflexible requirement for admissibility. Psychologists concur in their estimation that eyewitness testimony is often factually inaccurate and unreliable, being riddled with fantasy, prejudice, misperception, and bias. Yet such testimony is routinely admitted for jurors' consideration because it is insulated to some degree from the dangers of ambiguity, erroneous recall, flawed perception, and prevarication by the enforcement of procedural safeguards, such as opportunity for cross–examination. Regarding hypnosis as merely a device that aids the procurement of testimony and offers no guarantees concerning its factual accuracy would permit the development of concomitant procedural safeguards. Thus, the admissibility of relevant testimony that might be otherwise unattainable would be assured, while the integrity of the judicial process would be unimpaired.

(Footnotes omitted.) *See also* Note, *The Continuing Controversy of Hypnosis in the Legal Setting—The Need for a More Flexible Approach,* 12 Mem. St. U. L. Rev. 471, 515 (1982); *Brown v. State, supra.*

In his concurrence and dissent in *State v. Collins,* 296 Md. 670, 710–11, 464 A.2d 1028 (1983), Chief Judge Murphy of the Maryland Court of Appeals points out the analytical error made by those who would adopt *Frye* in hypnosis cases:

The "result" of hypnosis is not an assertion that the testimony is necessarily true or accurate. Although some proponents of hypnosis have suggested that memory retrieved by hypnosis is similar in accuracy to a videotape replay, no such claim has been made in this case and such a position is not generally accepted. Rather, the "result" of hypnosis is the ability to produce recall where there was little or none before. In this connection, there is little, if any, dispute that hypnosis is reliable in producing more recall. *See, e.g.,* Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va. L. Rev. 1203, 1208–14 (1981). Instead, those who oppose hypnosis in the courtroom focus attention on the accuracy of the recall. In effect, they (and the majority here) would seemingly require that hypnosis prove, as a matter of general acceptation, that all testimony based on memory recalled under hypnosis is historically accurate. Such a standard is virtually impossible to meet and, if applied to other evidence, would bar virtually all testimony and most other forms of evidence. Such a standard flies in the face of the truth–seeking process, by which the fact–finder is allowed to sift through the widest possible range of evidence, some of which, inevitably, is inaccurate, in order to best determine what actually occurred. Only where the scientific process itself purports to answer ultimate questions of truthfulness and credibility of evidence should the [*Frye*] test impose such a difficult standard. In the case of hypnosis, the claim is only that the recall produced is at least as accurate as other testimony.

The *Frye* test does not apply to hypnotically induced *witness* testimony. Rather it is concerned with the admission of scientific *expert* testimony. The majority fails to recognize this distinction and thus the logic of its position collapses. Nevertheless, since there are serious questions as to the circumstances under which this testimony (and, of course, any testimony) can be admitted, I will set forth

what I believe to be appropriate safeguards and procedures to be followed.

Psychologists and psychiatrists have pointed out the dangers inherent in any sort of memory retrieval, including that which is hypnotically induced. *See People v. Shirley,* 31 Cal. 3d 18, 57–62, 641 P.2d 775, 181 Cal. Rptr. 243, *cert. denied,* 459 U.S. 860, 74 L. Ed. 2d 114, 103 S. Ct. 133 (1982); Beaver, *op. cit.* at 155–56; Spector & Foster, *op. cit.* at 585. Note, *The Admissibility of Testimony Influenced by Hypnosis,* 67 Va. L. Rev. 1203 (1981). For an excellent discussion of this problem *see State v. Hurd,* 86 N.J. 525, 540–43, 432 A.2d 86 (1981); *Brown v. State, supra. See also* Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313, 335 (1980) and Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. of Clinical & Experimental Hypnosis 311, 317–18 (1979). (Both Dr. Orne and Dr. Diamond have been articulate leaders in opposition to the use of witnesses who have been hypnotized. *See People v. Shirley, supra* at 63 n.45.)

Hypnosis is said to be a state of heightened concentration with diminished awareness of peripheral vision. D. Cheek & L. LeCron, *Clinical Hypnotherapy* 13 (1968). By its nature hypnosis is a process of suggestion; consequently, great care must be taken to insure that statements after hypnosis emanate from the subject's own recollection rather than from suggestions received while under hypnosis. *United States v. Adams,* 581 F.2d 193, 198–99 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978). One of the primary effects of hypnosis is that the subject becomes extremely receptive to suggestions from the hypnotist. Diamond, *op. cit.* at 333; Orne, *op. cit.* at 322–27. A hypnotized subject suspends critical judgment and responds to the hypnotist's demands for exact, photographic recall even when the subject's memory is vague or doubtful. Diamond, *op. cit.* at 340. Once a subject has been hypnotized, neither the subject nor the hypnotist can separate true memories from fantasy. Diamond, *op. cit.* at 348.

Nonetheless, my examination of the scientific authority convinces me that where the purpose of using hypnosis is to assist in the restoration of a person's memory it has been established it can be a valuable tool and is comparable in reliability to ordinary recall. *See, e.g.,* Council on Medical Health, *Medical Use of Hypnosis,* 168 J. A.M.A. 186 (1958), *cited in* Dilloff, *Admissibility of Hypnotically Influenced Testimony,* 4 Ohio N.U. L. Rev. 1, 3 n.9 (1977). *See* L. Klob & H. Brodie, *Modern Clinical Psychiatry* 764–66 (10th ed. 1982); Wolberg, *Hypnotherapy,* in 5 *American Handbook of Psychiatry* 235 (S. Arieti ed. 1975); Spiegel, *Hypnosis: An Adjunct to Psychotherapy,* in *Comprehensive Textbook of Psychiatry* § 34.4 (A. Freedman & H. Kaplan ed. 1967); Spector & Foster, *op. cit.* at 582; Perry, *The Trend Toward Exclusion of Hypnotically Refreshed Testimony—Has the Right Question Been Asked?,* 31 U. Kan. L. Rev. 579 (1983).

As the court observed in *State v. Hurd,* 86 N.J. 525, 542–43, 432 A.2d 86 (1981):

> The fallibility of human memory poses a fundamental challenge to our system of justice. Nevertheless, it is an inescapable fact of life that must be understood and accommodated. Rather than require historical accuracy as a condition for admitting eyewitness testimony, we depend on the adversary system to inform the jury of the inherent weaknesses of evidence.

(Citations omitted.) *See also People v. Shirley, supra* at 76 (Richardson, J., concurring).

Although I believe pretrial hypnosis affects the credibility rather than the competency of the witness and am thus unwilling to adopt the per se rule of inadmissibility for matters recalled subsequent to hypnosis as does the majority, neither would I go so far as some courts, *see, e.g., Chapman v. State,* 638 P.2d 1280 (Wyo. 1982), and hold the value of the testimony of a previously hypnotized witness should be determined solely by an attack on the witness' credibility. While I share the view of the dissent of Justice Pro Tempore Thompson that the fundamental issue

is one of credibility rather than competency, I believe some procedural safeguards are necessary.

A number of procedural safeguards have been suggested. Essentially, they strive to reduce the possibilities for suggestiveness and attempt to provide a means to verify independently the recall of a witness who has been hypnotized. Courts have held testimony in a criminal case of the identification of the accused as the culprit must be excluded if the identification has been tainted by a prior or unduly suggestive procedure and has no independent origin. *See Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967); *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006 (1978).

In *People v. Smrekar,* 68 Ill. App. 3d 379, 385 N.E.2d 848 (1979); *State v. Hurd, supra;* and *State v. Long,* 32 Wn. App. 732, 649 P.2d 845 (1982), certain procedures are set forth to enable courts to determine the admissibility of hypnotically induced testimony. See majority, at 720. In neither *Hurd* nor *Smrekar,* however, are the factors listed "considered absolute prerequisites to admissibility, nor are they exclusive. They are listed to illustrate the nature of the inquiry." *State v. Hurd,* at 545. While I concur with *Hurd* and *Smrekar* that the trial court must review the hypnosis session to ensure that there was no impermissible suggestiveness in the procedures, an approach has been adopted by the Wisconsin court in *State v. Armstrong,* 110 Wis. 2d 555, 571–73, 329 N.W.2d 386 (1983), which I believe to be both workable and more suitable to protect the interests of all parties:

> Ordinarily, where the issue of the suggestiveness of an identification procedure is raised, the defense has the burden of demonstrating the suggestiveness. *Neil v. Biggers,* 409 U.S. 188, 196 [34 L. Ed. 2d 401, 93 S. Ct. 375] (1972). However, because of the great susceptibility a hypnotized subject has to suggestions made by the hypnotist, we conclude that in criminal cases, where the state or a defendant is attempting to use hypnotically affected testimony, the burden should be on the proponent to demonstrate that the hypnotic session was not

affected by impermissible suggestiveness such as to render the subsequent testimony inadmissible. If the state or the defendant propose to introduce the testimony of a witness who has been hypnotized, that fact should be revealed to the other side before trial so that a timely motion to suppress may be made and a suppression hearing held.

If the trial judge in the exercise of discretion determines that the testimony of a witness who has undergone hypnosis may be admitted, the defendant then may attack the credibility of the witness by raising the hypnosis issue. Because of what some commentators refer to as a "popular misconception that hypnotized people always tell the truth," the state should not reveal the fact of hypnosis in its case–in–chief. However, if the hypnosis issue is raised by the defense, the state should be allowed to introduce expert testimony on hypnosis to aid in the jury's assessment of the witness' credibility. Such a rule will allow the defendant to challenge the credibility of the witness without the danger that the jury will give undue weight to the testimony because hypnosis was used. It will also satisfy a defendant's right to confrontation in that the defendant will be in a position to ensure that the jury has a satisfactory basis for evaluating the witness' testimony.

Similarly, if the defendant is permitted to introduce testimony of a previously hypnotized witness, both sides should be permitted to introduce expert testimony on the effects of hypnosis on memory.

(Footnotes omitted.)

These procedures are workable and will provide adequate protections for the interests of all parties. I would adopt them and direct that they be used by the courts of this state. If the guidelines such as suggested in *State v. Hurd, supra, People v. Smrekar, supra,* and *State v. Armstrong, supra* at 571 n.23, are followed by a party wishing to use a witness who has been hypnotized, the work of the trial court will be greatly facilitated in determining whether there was suggestiveness in the hypnotic session. I emphasize, however, that these guidelines are just that. Compliance would not guarantee admission of the testimony; failure to comply would not require exclusion. The reliabil-

ity of the testimony of the hypnotized witness and its admissibility would be at the discretion of the trial court.

I do not share the majority concern that the expense or length of these procedures are reasons not to adopt them. Given the complexities of much contemporary litigation, I do not believe either the time or expense which would be involved in the procedures I advocate would be unreasonable nor would it be unduly burdensome to those parties interested in the integrity of judicial proceedings, including the public.

From the record, as recited in the majority opinion, it is apparent the procedures I have set forth were substantially followed. The trial court satisfied itself as to the admissibility of testimony by the witness who had been hypnotized. Defendant raised no objections as to the qualifications of the hypnotist, nor to the admission of audio- and videotapes of the hypnotic session. Furthermore, an expert witness who had seen the videotape of the hypnotic session involving the witness whose testimony was hypnotically induced testified on behalf of the defendant. I believe the trial court properly exercised its discretion in admitting the testimony of this witness and find no error. I would affirm the conviction.

UTTER, J., concurs with DOLLIVER, J.

THOMPSON, J.* (dissenting)—I dissent.

This case presents an unusual factual pattern. It seems to me that it is an almost unique situation when hypnosis is sought by the victim's mother without any participation by law enforcement personnel or the State. Ordinarily, the hypnosis would be initiated by law enforcement personnel as part of the investigation.

The real issue in this case is, should the testimony of a victim who has been hypnotized, where the State has no participation in the hypnosis, be excluded in whole or in

---

*Judge Donald H. Thompson is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).

part as *incompetent,* or should all of the victim's testimony be admissible along with evidence as to how hypnosis may affect its *credibility?*

Courts in other jurisdictions have divided their views as to the admissibility of hypnotically influenced testimony. *See People v. Lucas,* 107 Misc. 2d 231, 435 N.Y.S.2d 461 (1980). The views are that such testimony should be: (1) totally excluded on the basis that a witness who has been hypnotized is incompetent to testify; (2) admissible, on the premise that hypnosis bears on credibility rather than admissibility; (3) admissible, providing that specific procedures are followed. (This is the *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981) view, with the six requirements as set forth in the majority opinion.)

In my view this is simply a *credibility* issue, the view adopted by the Ninth Circuit Court of Appeals. *Kline v. Ford Motor Co.,* 523 F.2d 1067 (9th Cir, 1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506 (9th Cir, 1974); *United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885, 62 L. Ed. 2d 116, 100 S. Ct. 179 (1979).

The basis of the majority opinion is that the victim's testimony is the result of a scientific experiment. I submit that *testimony* in itself is not a result of a scientific experiment. It is not like the reading of a Breathalyzer, the analysis after a laboratory experiment, nor the opinion of an expert as to whether a witness is telling the truth after being administered a polygraph. What is being excluded under the majority opinion is lay testimony. The hypnotist's expert opinion as to whether or not the victim is telling the truth might rationally be analyzed to be the result of a scientific experiment. The expert's testimony, however, has not been challenged. In my opinion *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) does not apply.

There was no state participation in the hypnosis in this case. Therefore, the cases concerning eyewitness identification of a criminal defendant, which are analogous to the situation here, do not offer any help. *See State v. Greer,* 609 S.W.2d 423 (Mo. Ct. App. 1980). In those cases, the

testimony of the witness is challenged on the basis that there has been an improper lineup or showup. Here, a critical stage of the proceedings had not been reached at the time of the hypnosis; therefore, the Sixth Amendment right to counsel does not apply. *Kirby v. Illinois,* 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972). Likewise, since no state action was involved, there can be no due process challenge under the Fifth Amendment that the victim's testimony has been influenced by the state. *Neil v. Biggers,* 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972). If law enforcement personnel or the State had participated in any way in the hypnosis, then constitutional safeguards should apply as in the eyewitness cases.

The true basis for the majority opinion is that the victim's testimony influenced by hypnosis is unreliable and is therefore incompetent. The tendency of this court is toward reducing the grounds of incompetency. *See* E. Cleary, *McCormick on Evidence* § 61 (2d ed. 1972); ER 601; CrR 6.12; *State v. Smith,* 97 Wn.2d 801, 650 P.2d 201 (1982). *Smith* holds that a mentally retarded person is not incompetent to testify.

Under the majority decision, the testimony as to facts recalled prior to the hypnosis is deemed to be competent, and the testimony as to facts not remembered until after hypnosis is incompetent. I submit that, especially in cases dealing with child abuse, this rule may very well lead to the court receiving unreliable testimony. A victim may very well be withholding information prior to the hypnosis for reasons other than lack of memory, such as: (1) fear that if she talked, she would be punished by her father; or (2) perhaps her father told her, over the course of the illicit conduct, that she should never say anything about it to anyone; or (3) a feeling by the victim that she wished to protect her father from prosecution. Testimony as to such facts, if first related after the hypnosis, may be excluded under the majority rule. The trier of the facts would be receiving only part of the victim's story, which may not be the ultimate truth.

Many other persons undoubtedly have contact with child abuse victims that may very strongly influence the victim's testimony, including the mother, social workers, doctors and nurses, family and friends. We do not exclude the victim's testimony on account of any of these contacts. The nature and extent of such contacts are considered in weighing the credibility of the victim's testimony.

In my view, especially in cases in which there has been no state participation in the administration of the hypnosis, it would be better to present all of the evidence and let the trier of the facts sift through it for a determination of the truth. The testimony of the victim would be subject to impeachment by her prior inconsistent statements. Expert testimony as to the effect of hypnotism on the reliability of memory should be allowed.

There is an additional ground for affirming the trial court. The defendant, after learning of the victim's hypnotic session, submitted himself for hypnosis before another hypnotist. This information and the second hypnotist's conclusion that the defendant did not commit the offense were included as part of the defendant's motion in limine regarding the admissibility of the victim's testimony. The tape of the hypnotic session was introduced by the defendant and admitted into evidence.

Then, during trial, defense counsel made no objection to Teeter's (the victim's hypnotist's) qualifications as an expert nor the admissibility of the tapes of the victim's hypnotic sessions.

No objection having been made, the error, if any, has not been preserved for appeal. RAP 2.5(a).

For these reasons, I would affirm the trial court.

Reconsideration denied September 4, 1984.