UNITED STATES of America

v.

Harlan WAKSAL.

No. 81–6092–Cr–NCR.

United States District Court,
S. D. Florida,
Ft. Lauderdale Division.

Feb. 19, 1982.

Bruce Zimet, Asst. U. S. Atty., Miami, Fla., for plaintiff.

Donald L. Ferguson, Miami, Fla., for defendant.

ROETTGER, District Judge.

Defendant physician filed this motion to suppress the evidence of two-plus pounds of cocaine, one pound seized from his double set of underwear and the rest from his luggage as well as defendant's statements

at the time of his arrest. The motion was heard by the district court.[1]

The case is startlingly similar to *United States v. Smith*, 649 F.2d 305 (5th Cir., 1981). Only the names are different and some of the places. There are a couple of extra wrinkles in the instant case which will be discussed in detail later on.

## FINDINGS OF FACT

The court makes the following findings of fact: defendant is a physician currently engaged in the third year of his internal medicine residency program in Boston. In the last year Waksal met someone named Robert Johnson in a cocktail lounge in Boston and talked with him several times; defendant admitted to being "fascinated by his desperado type of thing". Johnson had told Waksal that Waksal's being a doctor would be a help in avoiding suspicion while carrying cocaine.

Subsequent to his arrest and *Miranda* warnings, defendant told the officers he had been lying by the pool at his family's condominium in Hallandale, Florida and an unknown person asked him to take cocaine to Boston. He insisted to the officers that was the way it happened although the officers expressed doubt that anyone would trust him with that quantity of drugs.

■ Waksal met a yacht broker named Hayes to discuss Waksal's interest in chartering a yacht in the future; they departed for Fort Lauderdale airport in order that Waksal could fly on to Boston. As reflected in the *Smith* opinion, and this court takes judicial notice of it: "The Miami-Fort Lauderdale area is known to D.E.A. agents as the most significant source of cocaine in the United States." 649 F.2d at 307.

Deputy Sheriffs Capone and Carl were working on the airport-narcotics detail at the Fort Lauderdale Airport on February 14, 1981, when defendant arrived with Hayes. Officer Capone noticed defendant come into the Delta Air Lines' terminal and stand by an unattended ticket counter. Defendant then looked directly at Capone and Capone observed defendant to be nervous at times. Defendant was carrying a briefcase and a carry-on bag with a shoulder strap. Defendant got in the ticket line and Capone moved to a position about fifteen feet behind defendant. Capone observed defendant to be "constantly scanning the terminal and still to appear somewhat nervous." Capone could see the airline ticket was purchased with cash and defendant did not check any luggage through.

Officers Capone and Carl stepped up to the defendant and his companion, Hayes, as they were leaving the Delta ticket area and identified themselves; they asked defendant if he had any identification and to show them his ticket. Defendant complied and showed them a driver's license from Ohio. Waksal identified himself as a physician in Boston. The doctor's age and his rather youthful appearance apparently caused the officers some difficulty in accepting that defendant was a physician.

Nevertheless, the officers explained they were narcotics agents who worked at the airport, gave an explanation about the drug problem in South Florida, and asked for defendant's cooperation with respect to his carry-on luggage. No weapons, handguns, handcuffs, or similar paraphernalia had been displayed or were displayed. Defendant explained that he was a doctor travelling to Boston and did not understand what the problem was. The officer stated there was no problem but he still wanted to go ahead and inspect the luggage. Defendant replied something to the effect of: "Yes you can."[2]

Carl was with defendant the entire time; defendant was never with Capone out of

---

1. Such matters are normally heard by the Magistrate and the review and recommendation is forwarded to the district court; time-schedule exigency dictated the matter being heard by the district court.

2. Carl testified Waksal's response to the request to inspect his carry-on baggage was ". . . okay or yes, you can. It was something in the affirmative reply." (Tr. 137). Capone characterized Waksal's response as "[s]omething to the effect that there's no problem." (Tr. 25).

Carl's presence. When Officer Capone asked Dr. Waksal at the point of stop whether he would mind if the officer did an inspection of the carry-on luggage, Dr. Waksal responded "Go ahead and look." When asked if he would accompany them into the small room, off the baggage area, the defendant replied: "Okay" and the officers asked him if he would carry his own bags.

An officer asked defendant to follow him and handed the one-way airline ticket back to defendant. At that point Mr. Hayes inquired about what was going on and received a reply from Officer Carl that they were just conducting an investigation; Hayes then chose to depart. They proceeded to a small room just off the Delta baggage area.[3]

Defendant carried his luggage back to the small room and the briefcase and carry-on bag were placed on the table. Defendant at no time had expressed any disapproval of searching the luggage. Agent Carl went through the carry-on bag and found three clear plastic bags containing a white powdery substance, and showed them to Officer Capone. Upon discovery of the cocaine, defendant exclaimed "How did that get there?" Then Capone placed defendant under arrest and handcuffed him. He patted defendant down for weapons and felt a large bulge in the crotch area of Dr. Waksal. Capone then pulled defendant's trousers down and found Dr. Waksal was wearing two pairs of underwear with a clear plastic zip-lock type envelope with a white powdery substance in it attached to the first pair of underwear and another clear envelope with a white powdery substance in the second pair of underwear. Defendant then stated "Do you realize what you've done to me and to my career?" Capone replied to defendant: "Well, we didn't place this cocaine on your body."

Capone left the room to go call for a unit to transport the defendant to a sub-station at the airport. Up to that point defendant never stated he didn't want the officers to search his bag or his person and they had not discussed the legal alternatives to a voluntary consent to the search.

After Capone had gone to call for transportation Dr. Waksal asked Officer Carl what the officers would have done if he hadn't consented to the search or even stopped to talk with them. Carl replied: "We have alternatives," but it went no further.

At the airport's narcotic sub-station of the sheriff's office the *Miranda* warnings were read by Officer Capone and again defendant asked what the officers would have done if he had not submitted or consented to the search or stopped to talk with them. Defendant wanted to know what their alternatives had been. They replied that they could have called ahead to his destination or gotten a narcotics-detecting dog to sniff the bag and in the event of a positive reaction to try to obtain a search warrant.

A further search was conducted at the station and three grams of cocaine were found in defendant's jacket.

## THE INITIAL POLICE CONTACT

■ As pointed out in *Smith*, the law in this circuit is clear "that the police may approach a citizen in an airport, identify himself, request identification, and briefly question the individual without bringing into play the proscriptions of the Fourth Amendment so long as the individual is not detained against his will or otherwise coerced into cooperating." *Id.* at 308, citing *United States v. Pulvano*, 629 F.2d 1151 (5th Cir. 1980) and *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979). Further, "[a]s long as the cooperation is voluntary and not the product of police coercion, a seizure has not occurred." *Ibid.*

As in *Smith*, defendant was neither required nor otherwise compelled to produce

---

**3.** Fort Lauderdale is a "single decker" airport; both the ticket counters and the baggage area are on the ground floor. Delta has a separate terminal of its own.

The court, from its awareness of the Delta terminal as well as the evidence, finds that the distance from the initial stop to the door of the small room does not exceed two hundred feet.

his identification or answer his questions. Upon request, Dr. Waksal elected to provide the information. He could have as easily elected not to cooperate, and simply walked away. Officer Capone testified that he has worked the airport-narcotics detail for some time and has made approximately 110 cases from the drug courier profile. He testified that some of the profile cases haven't resulted in arrests and some persons have chosen to leave.

■ This court must conclude, under the principles of *Smith*, that Dr. Waksal was not seized within the meaning of the Fourth Amendment at the time of the initial contact with the police. This court also concludes that appellant agreed in the ticketing/departure area to continue the matter and was not seized within the meaning of the Fourth Amendment at the time he went with the officers to the small office off the baggage area.

### THE SEARCH

The court's findings are set forth above but the question of the voluntariness of defendant requires some discussion of other matters.[4]

The court found defendant rather intelligent, as was expected. The court had some difficulty with some aspects of defendant's credibility. Defendant does not come across as "street-smart". Yet, he insisted from the witness stand repeatedly that he was not at all nervous at the airport while also maintaining he was carrying cocaine for the first time. Not only human experience but a number of years of presiding at numerous trials involving narcotics cases, compel the court to conclude that Dr. Waksal's testimony in that regard is lacking in credulity.

Defendant contends that Hayes, his airport companion, supports Waksal's position. Hayes testified that Waksal was not nervous but was very irritated.

The expectation that a physician would not actually be searched is suggested by the Government as the theory the doctor was following in cooperating and that he was subsequently surprised that it didn't work. The game-plan was suggested by the narcotic's confidant in Boston, Mr. Johnson: No one would suspect a doctor. Consequently, the role is carried out by a physician outraged and indignant at this affront of being stopped, and being accused of being part of the drug problem. The court finds it unnecessary to make a specific finding but the scenario painted by the Government is credible.

### ADDITIONAL MATTERS OF FLAVOR, BUT NOT SUBSTANCE, EXIST IN·THE CASE

■ (a) Defendant asserts that he passed the polygraphic examination but the officers did not. Polygraph findings are not admissible in the Federal court and this court declines to gallop into that canyon of non-evidence, however intriguingly it beckons.

■ (b) Officers Capone and Carl ended up in a squabble with the assistant state attorney who was handling this matter. Apparently, in the state system a defendant is automatically entitled to a preliminary hearing if an information is not filed by the State Attorney's office within twenty-one days of arrest. By the twenty-first day (actually the twentieth but the twenty-first

4. The court is not unmindful that the effect of this will hardly assist defendant's career and may likely abort it. Consequently the court has avoided its usual practice of announcing findings and conclusions immediately, or at least dictating them immediately into a pocket dictating device if the time doesn't permit such to be done from the bench, as was the instant situation. However, the court wanted to give defendant the benefit of some reflection and pondering by the court of the evidence as well as a chance to review the transcript. The court admits that such a procedure may not be completely defensible because the defendant's educational background and personal risk in the outcome of this case can entitle him to no more—and no less—consideration than that of any other defendant in similar circumstances whether the defendant be an M.D., or a non-English speaking immigrant. In fact, some Calvinistic citizens might suggest the doctor deserves less consideration because of his educational attainments and opportunities.

was on a weekend), the assistant state attorney had examined defendant's affidavit complaining about a lack of voluntariness and had concluded it must be correct because the officers had not come in with their case. The assistant state attorney admitted that he was surprised when Officer Capone showed up that day and a bit of a hassle ensued. Officer Carl heard about it and called that afternoon to verify that the officer's statements about the ability to obtain a search warrant were made after the search, not before.

In a sense the matter became a bit of a three-penny opera and the state attorney's office conducted an investigation of the two officers to see if they were telling the truth. This led to polygraph examinations and hypnosis sessions. Eventually, the state declined prosecution of defendant but the officers were also cleared. This court has concluded that those two conclusions could have no bearing on the court's determinations in the instant case. As an academic matter they in effect cancel each other out. In any event they hardly come under the admissibility umbrella of rule 803(8) of the Federal Rules of Evidence.

The Government insists that this court can consider the fact that Officers Capone and Carl felt so strongly about the matter that, knowing of searching cross-examination likely to ensue, they pressed the issue to the Federal authorities who presented the evidence to a Grand Jury and this case resulted. However plausible the contention of the Government, this court declines to consider that matter as well.

■ (c) The effect of hypnosis on credibility. As part of the review of the arresting officers by the State Attorney's office, both officers were hypnotized. The defendant presented Dr. Diamond, a psychiatrist on the faculty of the University of California, who has additional impressive credentials; his testimony was most interesting but basically his ultimate conclusion is that once a witness is hypnotized, the value of a witness' testimony is completely vitiated and the witness is thereafter incompetent because hypnosis tends to freeze the memory. Dr. Diamond admits that his "position is the extreme".

Several Federal courts have considered the admissibility of hypnosis testimony and Dr. Diamond's extreme position has been rejected. *United States v. Awkard*, 597 F.2d 667 (9th Cir. 1979); *United States v. Adams*, 581 F.2d 193 (9th Cir. 1978); *Kline v. Ford Motor Co.*, 523 F.2d 1067 (9th Cir. 1975); *Wyller v. Fairchild Hiller Corp.*, 503 F.2d 506 (9th Cir. 1974); and *United States v. Narciso*, 446 F.Supp. 252 (E.D.Mich.1977). The courts have adopted the position that hypnosis affects credibility but not admissibility.

This case is not like *United States v. Awkard*, 597 F.2d 667 (9th Cir. 1979), in which the witness could not recall certain matters until after hypnosis. Even under those circumstances the Court of Appeals held the testimony admissible and affirmed the conviction. The instant case is stronger in support of admissibility: the court observes that Officer Carl was with defendant the entire time at the airport and his statement of what occurred was filed after the dispute and confrontation between the assistant State Attorney and Officer Capone but before the hypnosis sequences. His testimony in that statement is consistent with what he testified to during the proceedings before this court.

This court has considered the potential for abuse from hypnosis, but finds instead that the officers' testimony after hypnosis months earlier is the product of the witness' own recollections.

## CONCLUSION

The motion to suppress the cocaine is denied but granted as to the statement made after arrest before *Miranda* warnings were given.