THE STATE OF OHIO, APPELLEE, *v.* WESTON, APPELLANT.

(No. CA83-02-013—Decided August 31, 1984.)

*Mr. George E. Pattison,* prosecuting attorney, for appellee.

*Mr. R. Daniel Hannon,* county public defender, for appellant.

*Per Curiam.* This cause came on to be heard upon an appeal from the Court of Common Pleas of Clermont County, Ohio.

In the early morning hours of July 6, 1981, William Stevenson, his wife, Linda Stevenson, their five-year-old son, William Stevenson, Jr., and Linda Stevenson's thirty-year-old brother, Edward Dowell, were found dead in their

home, located at 2610 Swings Corner Road in Clermont County, Ohio. The victims died of .22 and .38 caliber gunshot wounds. After the murders were committed, the residence was set ablaze using an accelerant later determined to be gasoline. Cash in the amount of $60,000 to $80,000 was believed to have been taken from the Stevenson residence, as well as an undetermined amount of jewelry and several handguns.

The Stevenson family owned and operated three fireworks stands along Ohio State Route 125. Gold and silver jewelry was also bought and sold at the stands. The two or three weeks immediately preceding July 4 were the peak season for the Stevenson businesses; during this period the fireworks stands grossed an estimated $200,000.

Carol Thompson, Linda Stevenson's daughter by a prior marriage, testified that she was in the company of the four victims on the evening of July 5, 1981. After closing the fireworks stands at 6:00 p.m., Thompson, her mother, brother, stepfather and Dowell purchased an automobile, went out to dinner, and returned to the Stevenson residence on Swings Corner Road at approximately 10:00 p.m. As Thompson prepared to leave the Stevenson home at approximately 10:30 p.m., two men arrived at the front door and were greeted by Linda Stevenson. One of the men Thompson immediately recognized as Ronald Thomas, a friend and business associate of her stepfather, William Stevenson. Thompson did not recognize the other man, whom she would later describe as a white male of stocky build with dark, messed-up curly hair. Thompson conversed with Thomas for a short time in a dimly lit hallway inside the Stevenson residence while the unknown individual stood nearby. At approximately 10:45 p.m., Thompson left the Stevenson residence and proceeded to her own home.

At approximately 5:00 a.m. on July 6, 1981, Thompson returned to the Stevenson residence after being notified by telephone that the residence was on fire. She was subsequently advised of the shootings, and furnished a preliminary description of the man she had seen with Thomas the previous evening. On July 10, 1981, Thompson viewed a photographic line-up of five individuals who were known associates of Thomas, and selected a photograph of defendant-appellant, Richard L. Weston. Thompson stated that Weston resembled the man who was with Thomas at the Stevenson residence the night of July 5, except that the man's hair was longer and more disheveled than defendant's hair appeared in the selected photograph. On July 14, 1981, Thompson was hypnotized by two Ohio State Highway Patrol officers in an attempt to cause her to more accurately recall the physical attributes of the individual.

At approximately 3:00 a.m. on July 6, 1981, an Amelia, Ohio, police officer, Jeffery Jenkins, observed a blue pick-up truck with a white camper cap exceeding the posted speed limit along State Route 125. The truck had Indiana license plates, and the driver carried an Indiana driver's license. Jenkins stopped the truck but elected not to issue a citation and did not call the driver's license number or social security number into the police dispatcher. The incident was dismissed by Jenkins as of little importance until two handbags belonging to Linda Stevenson were found in the Whitewater River near Brookville, Indiana, two days after the robbery-murder. Jenkins subsequently identified the defendant as the driver of the truck he stopped the morning of July 6. Jenkins was subjected to hypnosis by two members of the Ohio State Highway Patrol in an unsuccessful attempt to cause him to remember the license number of the truck and more details about the appearance of the vehicle and its operator. Evidence presented at trial

revealed that Thomas owned a blue pickup truck with a white camper shell at the time the Stevenson-Dowell murders were committed. * * *[1]

Defendant was arrested and taken into custody on July 14, 1981, for a parole violation, and subsequently convicted of the parole violation and of interstate transportation of stolen property, the latter charge being related to the instant case. Trial on these matters was held in federal district court in Indianapolis, Indiana, and defendant was subsequently incarcerated at the United States Penitentiary in Terre Haute, Indiana, until transferred to Ohio to stand trial on state charges related to the Stevenson-Dowell homicides. * * *

Defendant was transferred from the federal penitentiary in Terre Haute, Indiana, to Clermont County, Ohio, on July 6, 1982. On July 7, 1982, an arraignment was held, and defendant pleaded not guilty to four counts of aggravated murder. Defendant then filed a series of pre-trial motions: On October 7, 1982, a motion to dismiss the indictment due to denial of a pre-transfer hearing before being transported to Clermont County from the federal penitentiary in Terre Haute was filed; * * * on November 5, 1982, defendant filed a motion to suppress in-court identification testimony to be given by Thompson and Jenkins; on November 24, 1982, motions for change of venue, for view, and to sequester the jury were filed. In the following weeks, hearings were held on the various motions described above and other motions relating to discovery procedure. All motions were subsequently denied except the motion for view, which was granted in an entry dated January 10, 1983. On January 3, 1983, defendant filed a notice of alibi.

On January 14, 1983, a trial by jury was begun in the Clermont County Court of Common Pleas. The trial continued until February 9, 1983, and on February 10, 1983, a verdict was rendered finding defendant guilty of each of the four counts of aggravated murder. On February 11, 1983, Weston was sentenced to four consecutive terms of life imprisonment, the sentences to be served consecutively to defendant's federal convictions as well. Notice of appeal to this court was timely filed on February 15, 1983. Defendant presents the following assignments of error: * * *

Fifth assignment of error:

"The trial court erred to the substantial prejudice of defendant-appellant by overruling defendant-appellant's motion to suppress the in-court identification testimony of those state's witnesses who had been subjected to hypnosis for the purpose of enhancing or inducing their identification of defendant-appellant." * * *

Hypnotically Refreshed Testimony

In his fifth assignment of error, defendant asserts that the trial court erred in failing to grant his motion to suppress certain in-court identification testimony of state's witnesses Thompson and Jenkins on the basis that they had been hypnotized prior to trial for the purpose of refreshing or enhancing their recollection of events taking place the night of July 5 and the morning of July 6, 1981. At trial, Thompson identified defendant as the individual who accompanied Thomas to her mother and stepfather's residence the evening of July 5, 1981, and Jenkins identified defendant as the individual who was driving a blue pick-up truck stopped for speeding along State Route 125 at approximately 3:00 a.m. on July 6, 1981.

The art of hypnosis has been recognized and practiced for centuries, enjoying periods of favor and enduring periods of disrepute. However, only in relatively recent times has hypnosis

---

[1] Reporter's Note: The text of the opinion as it appears herein was abridged by the court.

282

been employed as an investigative technique and become subject to judicial scrutiny in an evidentiary and constitutional setting. The question of the admissibility of evidence based on hypnotism has manifested itself in two forms: first, efforts to introduce statements made under hypnosis for their truth, and, second, efforts to introduce testimony of witnesses whose memories have been "refreshed" by hypnosis. With regard to the first point, it appears settled that statements made under hypnosis are no more reliable than statements made in the absence of hypnotic influence. In the words of one court:

"The authorities state that while hypnosis often can produce remarkably accurate recall, it is also prone to yield sheer fantasy, willful lies, or a mixture of fact with gaps filled in by fantasy." *State* v. *Hurd* (1981), 86 N.J. 525, 538, 432 A. 2d 86, 92. See, also, *People* v. *Shirley* (1982), 31 Cal. 3d 18, 641 P. 2d 775, certiorari denied (1982), 459 U.S. 860.

Therefore, courts have almost uniformly rejected statements made under hypnosis offered for their truth. See *Shirley, supra,* at 34, 641 P. 2d at 783. Judicial response to hypnotically "refreshed" testimony has not reached a comparable state of uniformity; such testimony has been both admitted and disallowed on several theories. As the case *sub judice* involves hypnotically refreshed testimony and its admissibility *vel non* is a case of first impression in Ohio, we shall discuss these theories in some detail.

One approach has been to treat hypnotically refreshed testimony as any other present recollection refreshed. See *State* v. *McQueen* (1978), 295 N.C. 96, 244 S.E. 2d 414; *Clark* v. *State* (Fla. App. 1979), 379 So. 2d 372; *Harding* v. *State* (1968), 5 Md. App. 230, 246 A. 2d 302, certiorari denied (1969), 395 U.S. 949. A witness may read his own written statements or review other pertinent memoranda, written or otherwise, prior to giving testimony on a given subject in order to refresh his recollection of the subject. See, generally, McCormick on Evidence (3 Ed. 1984), Section 9; Evid. R. 612; Fed. Evid. R. 612.[2] A witness who has been subjected to pre-trial hypnosis is, under this approach, considered to have similarly refreshed his recollection. The possibility that the witness' memory may have been enhanced, distorted, or otherwise altered as a result of the hypnosis is viewed as a question for the trier of fact affecting the *credibility* of the testimony, but not its *admissibility. Hurd, supra,* at 535, 432 A. 2d at 91. Courts adopting this view take the position that skillful cross-examination will permit the trier of fact to evaluate the effect of hypnosis on the witness' testimony. See *Hurd, supra.*

While the "weight of the evidence" approach described above still retains some vitality (see *United States* v. *Waksal* [S.D. Fla. 1982], 539 F. Supp. 834; *Chapman* v. *State* [Wyo. 1982], 638 P. 2d 1280), its popularity appears to be declining, perhaps due to a gradual realization on the part of the courts that hypnotism may have a greater impact on testimony than previously suspected, and that the impact may be one which affects credibility in a manner

---

[2] The wide range of material which may be used to refresh a witness' memory is reflected in the following language from *Jewett* v. *United States* (C.A.9, 1926), 15 F. 2d 955, 956:

"[I]t is quite immaterial by what means the memory is quickened; it may be a song, or a face, or a newspaper item, or a writing of some character. It is sufficient that by some mental operations, however mysterious, the memory is stimulated to recall the event, for when so set in motion it functions quite independently of the actuating cause."

that emerges from cross-examination undetected. Expert testimony has caused courts to become concerned about hypnosis' potential to create "pseudomemories" having no basis in fact which the subject is unable to distinguish from actual memories. See, e.g., *Shirley, supra,* at 53, 641 P. 2d at 795. If the subject/witness is unable to distinguish actual memory from hypnotically induced memory, the effectiveness of cross-examination in revealing the effect of hypnosis on the memory of the witness to the trier of fact becomes suspect. See *Shirley, supra,* at 66, 641 P. 2d at 804.

Given the mysterious and unfamiliar nature of hypnosis and its significant potential for abuse, a number of courts have approached the problem of hypnotically refreshed testimony as courts have historically dealt with other novel scientific methods or procedures: through application of the test set forth in *Frye* v. *United States* (D.C. 1923), 293 F. 1013. The *Frye* test bases admissibility of evidence resulting from the new practice or procedure on whether the procedure is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye, supra,* at 1014. In *Frye,* the court considered the admissibility of results obtained from an early version of today's polygraph or "lie detector" test; the *Frye* test or its equivalent has since been applied to such diverse scientific procedures as voiceprint analysis (*People* v. *Kelly* [1976], 17 Cal. 3d 24, 549 P. 2d 1240; *State* v. *Cary* [1967], 49 N.J. 343, 230 A. 2d 384); police radar (*State* v. *Dantonio* [1955], 18 N.J. 570, 115 A. 2d 35); microscopic identification of gunshot residue particles (*People* v. *Palmer* [1978], 80 Cal. App. 3d 239, 145 Cal. Rptr. 466); human bite marks (*People* v. *Slone* [1978], 76 Cal. App. 3d 611, 143 Cal. Rptr. 61); breath analysis devices designed to test for intoxication (*People* v. *Morse* [1949], 325 Mich. 270, 38 N.W.

2d 322); and ink identification tests (*United States* v. *Bruno* [E.D. Pa. 1971], 333 F. Supp. 570).

The courts have shown some reluctance to apply the same test to hypnosis as is applied to other more "mechanical" or "scientific" truth-detection devices such as the polygraph, voice print analysis and laser beams. See *United States* v. *Narciso* (E.D. Mich. 1977), 446 F. Supp. 252; *Commonwealth* v. *A Juvenile* (1980), 381 Mass. 727, 412 N.E. 2d 339. See, also, commentary to the same effect in Perry, The Trend Toward Exclusion of Hypnotically Refreshed Testimony — Has the Right Question Been Asked? (1983) 31 U. Kan. L. Rev. 579, 600-602 (hereinafter cited as Perry, The Trend Toward Exclusion); Note, The Continuing Controversy of Hypnosis in the Legal Setting — The Need For a More Flexible Approach (1982), 12 Mem. St. U. L. Rev. 471, 515-520. Perhaps this is one reason the weight of the evidence approach yet retains its popularity. Dr. Martin Reiser, who testified as an expert in the area of forensic hypnosis at the suppression hearing below, was of the opinion that the *Frye* test was inapplicable to hypnosis because hypnosis is merely an interview technique, not a truth detection technique. However, the *Frye* test or its equivalent has recently been applied to hypnosis by a number of courts in a variety of states, including New Jersey (*Hurd, supra*), California (*Shirley, supra*), Minnesota (*State* v. *Mack* [Minn. 1980], 292 N.W. 2d 764), Michigan (*People* v. *Tait* [1980], 99 Mich. App. 19, 297 N.W. 2d 853), Pennsylvania (*Commonwealth* v. *Nazarovitch* [1981], 496 Pa. 97, 436 A. 2d 170), New York (*People* v. *Hughes* [1983], 59 N.Y. 2d 523, 453 N.E. 2d 484), Florida (*Rodriguez* v. *State* [Fla. App. 1976], 327 So. 2d 903, certiorari denied [Fla. 1976], 336 So. 2d 1184), and Arizona (*State* v. *Mena* [1981], 128 Ariz. 226, 624 P. 2d 1274).

However, application of the *Frye*

rule to hypnotically influenced testimony has not produced uniform results. The two decisions which perhaps best reflect the current division between courts that have rejected hypnotically assisted testimony on the basis of the *Frye* doctrine and courts that have admitted such testimony as meeting the requirements of the *Frye* test are *Hurd, supra,* and *Shirley, supra.*

In *Shirley,* the California Supreme Court found hypnotically induced testimony to be "so widely viewed as unreliable that it is inadmissible under the *Frye* test." *Shirley, supra,* at 40, 641 P. 2d at 787. In its opinion, the court first addressed problems with eyewitness testimony in general, noting that the belief that human memory is comparable to a videotape machine that merely "plays back" past events (a view attributed to, among others, Dr. Martin Reiser, who testified on behalf of the state in the case *sub judice*) has been much criticized in professional medical journals and publications. *Shirley, supra,* at 57-66, 641 P. 2d at 798-804. These publications[3] indicate that memory is not a passive but an active, continually changing phenomenon; it is more accurately described as " 'an affair of construction rather than one of mere reproduction.' " *Shirley* at 58, 641 P. 2d at 798. As a result, witnesses may "compromise" their memories with a subsequently learned inconsistent fact, "incorporate" a non-existent event or fact suggested by a third party, or otherwise distort their memories due to any number of post-event feelings, suggestions or occurrences. *Shirley* at 60, 641 P. 2d at 800. Further, a witness may "guess" at certain gaps in memory and subsequently be unable to distinguish actual memory from the guesses made to fill in the gaps, a process called "confabulation." *Shirley, supra.*

After reviewing the problems inherent in eyewitness testimony and memory generally, the *Shirley* court examined the application of these problems to hypnotically refreshed testimony, relying heavily on articles composed by Dr. Martin T. Orne[4] and Dr. Bernard L. Diamond,[5] who are described as "the most persuasive spokesmen for the relevant scientific community * * *." *Shirley, supra,* at 63, fn. 45, 641 P. 2d at 802. The court drew the following conclusions: (1) Hypnosis is by its nature a process of suggestion, and suggestions can be transmitted unintentionally during a hypnotic interview. Further, such unwitting suggestion may not be detected, even by experts, either during or after a hypnotic interview has taken place. (2) The person being hypnotized experiences a compelling desire to please the interviewer, and may unconsciously fantasize memories or fill in gaps in his or her memory in an effort to fulfill the hypnotist's perceived expectations. (3) During the hypnotic session, it is impossible for either the subject or the hypnotist to distinguish between true memories and pseudomemories. (4) A witness uncertain of his or her memories prior to hypnosis will be convinced that the story he told under hypnosis is absolutely true and correct. Further, the witness, after hypnosis, will often be unable to distinguish between what he remembered before hypnosis and what was added to

---

[3] The court cites, *inter alia,* Bartlett, Remembering (1932, reprinted 1964), Hintzman, The Psychology of Learning and Memory (1978), and Loftus, Eyewitness Testimony (1979).

[4] Orne, The Use and Misuse of Hypnosis in Court (1979), 27 Internatl. J. Clinical & Experimental Hypnosis 311.

[5] Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness (1980), 68 Cal. L. Rev. 313.

the memory as a result of the hypnosis. In other words, the source of the hypnotically induced memory is forgotten and merged with prior memory, a phenomenon called "posthypnotic source amnesia." The court also found that the witness' conviction as to the truth of his hypnotically enhanced recollection grows stronger every time the memory is repeated prior to trial, rendering traditional cross-examination techniques ineffective in disclosing the fallibility of the purported recollection. *Shirley* at 63-66, 641 P. 2d at 802-804.

The court in *Shirley* concluded that current professional literature on the subject of hypnotically refreshed testimony "demonstrates beyond any doubt that at the present time the use of hypnosis to restore the memory of a potential witness is *not* generally accepted as reliable by the relevant scientific community." (Emphasis *sic*.) *Shirley, supra,* at 66, 641 P. 2d at 804. The testimony of all witnesses who have undergone hypnosis for the purpose of restoring their memories was therefore held inadmissible as to all matters relating to the events explored under hypnosis. *Shirley, supra.*

In *Hurd, supra,* the Supreme Court of New Jersey applied the *Frye* test to hypnotically refreshed testimony and reached a different conclusion than the Supreme Court of California did in *Shirley, supra.* The *Hurd* court noted that the purpose of hypnosis used to refresh memory is not to obtain the truth, but merely to restore the memory of the witness. *Hurd, supra,* at 537, 432 A. 2d at 92. The court acknowledged that the human memory and eyewitness testimony are often prone toward error, but did not consider this to be a sufficient reason to absolutely reject hypnotically refreshed testimony under *Frye,* given that the reason for the hypnotic procedure is only to "refresh" the witness' memory:

"In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate. * * * If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory." *Hurd, supra,* at 538, 432 A. 2d at 92.

As a result, the *Hurd* court declined to adopt a rule of *per se* inadmissibility for hypnotically refreshed testimony as did the court in *Shirley, supra.* The court declared such a rule to be "unnecessarily broad," and predicted that it would "result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." *Hurd, supra,* at 541, 432 A. 2d at 94.

The *Hurd* court, as did the court in *Shirley,* recognized that hypnotic "refreshment" of witness memory could result in the manufacture of fictitious memories through suggestion or confabulation, and purported to solve this problem by setting forth a series of guidelines for determining the reliability of hypnotically refreshed testimony. First, the "appropriateness of using hypnosis for the kind of memory loss encountered" should be considered. *Hurd, supra,* at 544, 432 A. 2d at 95. In some cases, the court felt that the subject/witness might have no memory to revive (for example, if the witness were severely intoxicated at the time of the incident sought to be recalled) which would severely diminish the likelihood of obtaining accurate recall through hypnosis or any other means. The *Hurd* court also urged inquiry as to whether the witness has any discernible motivation for remembering or not remembering certain events: "[i]n either case, the possibility of creating a self-serving fantasy is significant." *Hurd, supra,* at 544, 432 A. 2d at 96.

Once it is determined that hypnosis is appropriate for use in the case under

consideration, the court in *Hurd* set forth six procedural safeguards designed to ascertain whether the hypnotic interview was conducted in a manner likely to yield reasonably reliable results. They are: (1) A psychiatrist or psychologist experienced in the use of hypnosis must conduct the hypnotic session. (2) The professional conducting the session should be independent of and not regularly employed by the prosecution, the defense, or investigators involved in the case. However, the hypnotist may collect a fee from the party engaging his services. (3) Any information given the hypnotist must be recorded, either in writing or in another suitable form. (4) Before inducing hypnosis, the hypnotist should obtain a statement of facts from the subject as the subject remembers them. (5) All contacts between the hypnotist and the subject must be recorded. (6) Only the hypnotist and the subject should be present during all phases of the hypnotic session, including during pre-hypnotic and post-hypnotic interviews. *Hurd, supra,* at 545-546, 432 A. 2d at 96-97. The court prefaced the guidelines discussed above with the following language: "None of these factors should be considered absolute prerequisites to admissibility, nor are they exclusive. They are listed to illustrate the nature of the inquiry." *Hurd, supra,* at 545, 432 A. 2d at 96.

This court is thus confronted by three lines of authority concerning the admissibility of hypnotically refreshed testimony. The first line merely views the fact that a witness has been subjected to pre-trial hypnosis as a weight of the evidence question for the trier of fact. See, *e.g., Waksal, supra,* and *Chapman, supra.* The second line holds hypnotically refreshed testimony *per se* inadmissible due to its lack of general ac-

ceptance in the scientific community in which it belongs. See *Shirley, supra.* The third line of authority finds the *Frye* test to be satisfied and would impose certain safeguards to assure the accuracy of hypnotically influenced testimony admitted. See *Hurd, supra.*

We consider the weight of the evidence approach to be too simplistic because it fails to recognize the possibility that hypnotically "refreshed" testimony may be tainted in ways that may escape the perspicacity of the most vigilant juror. A rule requiring *per se* exclusion of hypnotically refreshed testimony raises a number of troubling concerns: First, we feel that the interpretation of the application of the *Frye* rule to hypnotically refreshed testimony mandates the general acceptance of hypnosis within the scientific community to which it belongs as a method which, in some cases, may aid the recollection of witnesses. Second, while it is beyond dispute that eyewitness testimony is often unreliable,[6] we are not convinced that the inherent unreliability of such testimony is significantly increased by properly and impartially administered hypnosis. Problems such as confabulation, incorporation of subsequently learned facts or facts inadvertently suggested by others, and the increasing conviction that the story one is telling is correct as the story is repeated over and over again are not unique to hypnotic testimony; they are problems inherent in all eyewitness testimony. Accord, see Perry, The Trend Toward Exclusion, *supra,* at 602-603. If courts were to exclude all eyewitness testimony not shown to be scientifically reliable we might very well, in the words of Justice Kaus, concurring and dissenting in *Shirley, supra,* at 76, 641 P. 2d at 810, "have little choice but to return to trial

---

[6] For a comprehensive discussion of reliability problems inherent in eyewitness testimony, see Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification (1977), 29 Stan. L. Rev. 969.

by combat or ordeal." Third, we are concerned that the adoption of a *per se* rule excluding hypnotically refreshed testimony may unnecessarily exclude reliable, probative evidence. As a rule, the truth-finding process is best served by liberal standards of admissibility, and the rules of evidence reflect this predisposition: "All relevant evidence is admissible, except as otherwise provided * * *." Evid. R. 402. We find the words of one commentator to be well-taken in this regard:

"* *'* *Shirley* [*supra*], and similar cases represent a dangerous trend toward closing the courtroom door on evidence that might well be helpful to the finder of fact. * * * It would be unfortunate to bar a particular class of evidence unless it were clearly necessary to do so." Perry, The Trend Toward Exclusion, *supra,* at 604.

Therefore, we hereby adopt the reasoning of the New Jersey Supreme Court in *Hurd, supra,* and find hypnotically refreshed testimony to be admissible provided there is compliance with certain safeguards which tend to assure that such testimony is as trustworthy as other eyewitness testimony. We find the factors set forth by the New Jersey Supreme Court in *Hurd* to be of great value in this regard, and we take them, as they were intended (see *Hurd, supra,* at 545-546, 432 A. 2d at 96-97), to be instructive of the general inquiry only. No single factor is mandatory or controlling, and inquiry in other cases may require discussion of other factors not mentioned in *Hurd* or discussed below.

Regarding the initial concern expressed by the New Jersey Supreme Court in *Hurd,* we feel the record indicates that both Thompson and Jenkins were appropriate subjects for hypnotic memory refreshment procedures. Both witnesses had witnessed certain events of interest to law enforcement authorities and both were capable, at least in theory, of furnishing eyewitness descriptions of those events to the police. Neither subject had any discernible reason to fabricate the memories sought to be refreshed by hypnosis.

Application of the procedural safeguards set forth in *Hurd* to the facts of the case at bar reveals a few disparities, but none significant enough as to require exclusion of the identification testimony of either Thompson or Jenkins. The first safeguard requires that a psychiatrist or psychologist experienced in the use of hypnosis conduct the hypnotic interview. The interviews in the case *sub judice* were performed by two members of the Ohio State Patrol who were not psychiatrists or psychologists. Lieutenant Douglas C. Wells had received over seventy-five classroom hours of hypnosis training under a psychologist, and had hypnotized over twenty people prior to hypnotizing Thompson and Jenkins. Sergeant Phillip Osborne had also received over seventy-five hours of training in hypnosis, and testified that he had participated in fifty-eight or fifty-nine hypnotic sessions since 1979. While these two men were not psychiatrists or psychologists, they obviously had a great deal of experience in hypnotic interview techniques, probably more experience than a number of psychologists or psychiatrists. It is our view that if the hypnotist is qualified and competent, it should be of no moment whether or not the hypnotist is a licensed psychologist or psychiatrist. This view is supported by the testimony of Dr. Reiser below, and by at least some legal commentators. See, *e.g.,* Note, A Survey of Hypnotically Refreshed Testimony in Criminal Trials: Why Such Evidence Should Be Admitted in Iowa (1982-1983), 32 Drake L. Rev. 749, 783. Therefore, we are satisfied that Osborne and Wells were adequately qualified to conduct the hypnotic interview sessions at issue.

The second procedural safeguard

set forth in *Hurd* requires that the person (or persons) performing the hypnosis be independent of the prosecutor, the defense, and investigative authorities. While Osborne and Wells were Ohio State Patrolmen, they were not involved in the instant case in any way other than conducting the hypnotic interviews at issue.[7] Further, the record fails to indicate that Osborne and Wells were given any information other than information any other hypnotist would have received prior to conducting a hypnotic interview for the purpose of refreshing a subject's recollection of certain events. The fulcrum of this requirement is to insure that no memory "cues" will be consciously or unconsciously transmitted from hypnotist to subject during the interview, and we are of the opinion that Osborne and Wells were sufficiently detached from the investigation to assure the impartiality of the interviews.

The third *Hurd* safeguard requires that any information given to the hypnotist prior to the hypnotic session be in writing. The purpose of this requirement is to "help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion." *Hurd, supra,* at 546, 432 A. 2d at 96. No such writing was made in the case of either witness in the case *sub judice.* However, both witnesses did give detailed statements to the hypnotists prior to being hypnotized stating their present memories of the events to be explored under hypnosis. Further, an audio tape was made of both hypnotic sessions. Under these circumstances, any information communicated to either of the subjects by either hypnotist would be easily discernible. The record fails to reveal any feeding of information to

either Thompson or Jenkins during hypnosis. This conclusion was confirmed by the testimony of defendant's own hypnosis expert at trial.

The fourth procedural safeguard requires that the hypnotist obtain from the subject a detailed description of facts remembered by the subject to insure that the hypnotist avoids improperly influencing the witness' recollection while the witness is under hypnosis. There was compliance with this safeguard below.

The fifth safeguard states that all contacts between the hypnotist and the subject should be recorded. Again, the record reveals compliance with this requirement. Both hypnotic sessions were recorded on audio tape and later transcribed into writing.

The sixth and final safeguard set forth in *Hurd* suggests that only the hypnotist and the subject be present during all phases of the hypnotic interview, as the presence of others may influence the subject's responses and increase the risk of inadvertent suggestion. Again, the record indicates that this safeguard was complied with in the case at bar.

Based on the analysis above and the application of the *Hurd* factors to the instant case, we are convinced that the identification testimony of state's witnesses Thompson and Jenkins was admissible. Examination of the procedures followed in the pre-trial hypnosis of both witnesses reveals that their testimony was based on memory comparable in its accuracy to normal recall. We note that neither witness offered any information while under hypnosis that had not already been substantially relayed to law enforcement authorities in statements made prior to hypnosis. *Further, the record contains a signifi-*

---

[7] The Ohio State Patrol as an organization was not involved in the case at bar in any other way. The investigative agencies involved were the Clermont County Sheriff's Department, the Indiana State Police, and the FBI.

*cant amount of circumstantial evidence which tends to support the disputed identification testimony of Thompson and Jenkins.* Thus, defendant was not prejudiced by the admission of the testimony of Thompson and Jenkins into evidence.

Defendant also raises in his brief the contention that the admission of the identification testimony of witnesses Thompson and Jenkins after they had been subjected to pre-trial hypnotic refreshment of their testimony violates his right to confront witnesses against him per Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the Constitution of the United States as made obligatory upon the states by the Fourteenth Amendment. See *Davis* v. *Alaska* (1974), 415 U.S. 308; *Pointer* v. *Texas* (1965), 380 U.S. 400; *State* v. *Swiger* (1966), 5 Ohio St. 2d 151 [34 O.O.2d 270], certiorari denied (1966), 385 U.S. 874. Defendant's theory is that cross-examination of witnesses who have been previously hypnotized is impossible because they are overly confident that their recollections, as "refreshed" by hypnosis, are correct. It is our observation that witnesses that have not been subjected to pretrial hypnosis are often falsely confident about their testimony and that witnesses are commonly "rehearsed" prior to trial in order to enhance the "credibility" of their testimony. In fact, one commentator suggests that there is often a *negative* relationship between a witness' projected confidence in his testimony and the strength of his actual memory. See Note, Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification (1977), 29 Stan. L. Rev. 969, 985. If there is substantial compliance with the safeguards described above for the admission of hypnotically refreshed testimony, it is our view that the accused's right of confrontation is preserved.

Accordingly, we find that the identification testimony was properly admitted below, and we find defendant's fifth assignment of error not to be well-taken.
* * *

It is the order of this court that the judgment appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

HENDRICKSON, P.J., and KOEHLER, J., concur.

JONES, J., concurs separately.

JONES, J., concurring. I concur in affirming appellant's conviction, but am not prepared to grant our imprimatur to the use of hypnosis for the purpose of refreshing the recollection of a witness. It is a fact, of course, that hypnosis can and does occur. The scientific community recognizes the phenomenon. It is equally clear that some individuals are more prone to hypnotic suggestions than others. Nevertheless, there are too many unknowns involved to elevate hypnosis to the scientific level we should require in a court of law. In *State* v. *Mena* (1981), 128 Ariz. 226, 231, 624 P. 2d 1274, 1279, the Arizona Supreme Court held "until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases." I am in general agreement with such statement, but would not find it necessary to exclude all of the testimony of a witness simply because only a portion of it constituted hypnotically induced testimonial recall.

In the case at bar, Carol Thompson selected a photograph of the appellant from a photo array shown to her on July 10, 1981, four days before she underwent hypnosis. It would therefore be

290

manifestly unjust to exclude such photographic identification on the theory that it later became tainted while under hypnosis. If, however, Thompson had later recalled under hypnosis, that appellant was wearing a blue tie and had a mole on his right cheek, or some similar characteristic, the hypnotically refreshed recollection should be excluded as undependable. In such an instance, there would be no reason to exclude the photographic identification as being tainted.

In the case at bar, the challenged identification was overwhelmingly supported by circumstantial evidence which virtually leaves no room for doubt that Richard L. Weston was present at or near the scene when the victims were executed. There has been no showing that the hypnotic refreshing procedure was either helpful to the state or damaging to appellant. I therefore conclude that the use of hypnosis to refresh the recollections of both Thompson and Jenkins did not taint their prior identification, and accordingly did not affect the outcome of the trial. Accordingly, the conviction should be affirmed.